on behalf of Mr. Herrera, John Yetter, on behalf of the people, Mr. Matthew Dish. Thank you, Mr. Yetter. Thank you. You may proceed. Good morning, please. My name is John Yetter. I represent Juan Herrera, who is currently in custody of the Department of Corrections, serving a sentence on the matter before you. The matter before you, in its essence, was best distilled by Officer Walcott during his testimony in this matter. It is a drug rip-off. That is where it starts. The state's case, in every way, relies on placing the defendant in the original drug deal. If they can't, each of the seven counts against him fails in some way, as the possession or possession with intent is in fact a predicated offense for all four of the murder counts and the armed violence. Well, wasn't he connected with it? He brought the receptacle or container and gave it to Cervantes for the drugs to be brought into the house. So how could he not be connected with it? Just to make sure that I heard you correctly, I don't think he brought anything. He lent, at a prior time, a vessel. It's a lockbox, I think is what it actually is, although it is referred to as a safe. What does the record reflect in terms of when that transaction, or whatever you want to call it, maybe more informally, that lending of the receptacle, when did that take place with regard to the October drug deal? The record isn't specific. It doesn't say on this date, at this time. It simply says prior. So we don't know if it was 10 minutes prior, half an hour prior, or another day prior? You can surmise from the record that it was within the week before, because that's approximately how long Mr. Herrera had been in the state of Illinois, and it had been purchased here in the state of Illinois. So he was not the only one charged and convicted, or pled guilty. Everyone, basically, that was there on that day was charged and pled guilty, or were convicted, correct? There were three co-defendants of the six. I mean, there were many people in the house. There were three co-defendants to my client, Mr. Cervantes, Mr. Vasquez. Sorry, I'm really bad at names. Mr. Rodriguez. Mr. Vasquez, who was the, I'm going to call him the homeowner even though he was renting it, and provided the place for the deal, received 10 years for a drug charge related to drugs actually that were not involved in this deal. He pled to a marijuana charge. The underlying case here is a cocaine deal. When the house was ultimately searched after this event, they found other things. I believe nearly 10 pounds of marijuana, although I'm not sure on the weight. And he ended up pleading to a 10-year deal on that. Mr. Cervantes did ultimately plead and get 20 years, a 20-year deal on the murder. He is the one of the three co-defendants who did not testify. And the other co-defendant who did testify got 15 years on drug-related offenses. Mr. Diaz, who was the decedent or the victim in this case, partner in the deal, was never apprehended. And Mr. Valdez, obviously, was deceased. Those were all of the people who were in the basement of the house. Correct. So they were all charged and sentenced to something. Correct. Although Mr. Vasquez is not actually related to this underlying offense. It was for other matters in subsequent investigation. Well, he gave testimony, too. He did. No, he did not. Okay. So the issue that you were raising before the court is that the evidence was insufficient, that the statement should have been suppressed, and the defendant did not properly waive his right to testify, correct? That's correct. So you didn't raise anything about the inconsistency with respect to the sentences that these individuals got as a result or in comparison to your client? Only in the sense that it is clear that the two who testified clearly got a deal for testimony. The one who did not testify, Mr. Cervantes, was pled afterwards and pled to the murder. So how does that make your client not culpable or not guilty? Well, my client's culpability has nothing to do with the culpability of the other people. Correct. The others were all in the basement, all part of the deal. The state presented essentially two types of evidence in an attempt to make my client culpable, okay? One is the testimony of the two co-defendants. The other was my client's recorded statement. My client's recorded statement is where the fact of the vessel comes from. The testimony of the two co-defendants is what puts my client at the scene, although frankly their testimony is terrible. In my brief, I went on for several pages about the inconsistencies between the two testimonies. I'm not going to, certainly in 15 minutes can't redo that. They only agreed essentially on three things. Neither one of them knew my client. They had both been involved in drug deals with the same set of people before. In fact, I believe what they said is prior to the 24 hours surrounding this, they had never met my client. And that this was the third drug deal that the people who were actually in the basement of the house arranged together. It was the second in this house. And the third thing that they agree on is that my client did not bring the gun that he was holding it for, that someone had given it to him when they left him upstairs when they went downstairs to do the drug deal. But he knew that there was a drug deal going on down there. I mean, he had sampled the drugs himself so that he didn't leave the premises. He stayed there holding a gun and he had the keys to the car as well. I believe that only one of the two co-defendants say that he sampled the drugs. Didn't he say that? Yes. In terms of his involvement, though, he did leave the scene where the drug deal was going to be. He was invited not to be there. He was not part of the mission. He did leave the house and he held the gun and the car keys. So, I mean, accountability, to defeat accountability, he would have had to leave, would he not? I don't think that there's a time and space distance on how far you have to leave. The deal happens essentially immediately. His ride, even though he was holding the keys, he was not the possessor of the car. It was not his car. He was holding keys. The car had been rented by Rodriguez for Cervantes. In the big picture, in the statement, what comes in is my clients come from out of state to visit Cervantes, who was an old friend of his. So his ride and his place to stay in Illinois was Cervantes. He left, at least as far as he could have before the deal began. If we look at each one of these individual things, certainly we may be able to argue about that, but when we're talking about the totality of all the circumstances, we're talking about this gentleman arriving with Cervantes, with the drugs, with the box that he bought and loaned to Cervantes that contained the cocaine, him ultimately indicating that he knew there was going to be a drug deal, him holding the weapon during the drug deal, which could be reasonably inferred as protection, or maybe a fact finder could see it as that. When we put all these things together, how does that not, based on his statement, forget about the two other individuals, but based on his statement, I understand you have an argument about his statement and maybe it should have been suppressed, but other than that, let's assume the statement comes in and it's solid and it's not suppressed. Isn't that enough based on all these things? I believe that there's an argument about the gun and its relation to the actual deal. If you look at what Mr. Rodriguez actually says in his testimony, the argument's clear that the gun is completely unrelated to the drug deal. The discussion they had about it, they passed it around the group, the discussion they had about it was whether Mr. Rodriguez was willing to sell it. They intentionally removed it from the scene of the drug deal. Didn't he admit, though, your client, admit that he probably had the gun in case something went wrong? Didn't he make that statement to the police? Something that, I'm probably getting the words wrong, but something that... I don't think it was anywhere near that direct, if you'll excuse my interpretation of it. And again, we're presuming for the moment that that statement should have come in. At the time my client makes that statement, he is heavily medicated. Even the police, during the 24 to 48 hours earlier, are wary of their ability to question him. The statement that he made in the hospital, there was nothing in that statement that was incriminating anyway, correct? No, and I don't raise that. And in fact, I don't believe there was any mention of it at trial, other than Officer Walcott said, yeah, I met with him on this day. And essentially, the statement from the hospital was nonsense. And Officer Walcott referred to it as he drifted off or began to seem to think. It was clear that he was under no condition at that point to be questioned. Officer Walcott just ended the question. It was going nowhere, amounting to nothing. So then his next statement was three days later. That's correct. At the police department. It was the day after he was released from the hospital. Videotaped. Correct, in two parts. And did you watch the videotape? Yes, ma'am. And there was, I think, one point in that videotape where he may have winced. And at one point where he said something like he was starting to hurt, but it wasn't time for his meds, correct? Correct. So was there anything in that statement that made you feel or tell me what in that statement, the videotape statements, made you feel that he didn't knowingly give that statement? His affect was certainly off. As you watch the video, there are several moments in it where he's asked a question and he kind of. . . He's a little slow in responding, correct? That's what I'm getting to. And I believe that, yes, that there are several instances of it where it's clear he's trying to process what's being asked of him. And it is not coming easily to him. But he answered it nonetheless. He did. I mean, did he ever make a statement like, you know, he was asked what time of day it was when something happened, and he said the moon was made of blue cheese or something? I mean, green cheese, did he ever say that? He never said anything that was. . . Off the wall. Outright lunatic. But it was clear throughout the video he was struggling with the process of what was going on. His understanding was clearly limited to some extent. My position on this is it's clearly something that should have been subject to a motion to suppress. And if it were subject of a motion to suppress, what is your position with respect to success on that motion to suppress? Because isn't that the whole issue here? Yes, and I believe that in totality of the record, when you look at the medical records, when you look at the medication, it's clear he's impaired. And I believe that based on what you see in the record and essentially what the defendant's testimony would be about the statement, as was contained in the post-trial motions, that there's going to be a statement from a defendant which says, no, I didn't clearly understand, and there's going to be medical records which validate that. I believe that that is the recipe for a successful motion to suppress. Do you think the statement at the hospital was prejudicial to your client, the admission of that statement at the hospital? Just that statement? No, not particularly. I don't think I really focused on that in my briefings on this because as I read through what was actually said and what Detective Walcott testified to, it just kind of comes off as nothing. I mean, it's clear even from Officer Walcott's testimony about it, there was nothing there. Well, and when we shift to the next one, the statement at the police station, I mean, in your brief, and I don't know if you're talking about both statements combined or just the statement that appears to be just the statement at the police station, but on page 40, you say that the defendant's statement did little to connect the defendant to the crime. And on page 47, you say it's not debatable the damage to the defendant's case that was done by the entry of the statement. So it seems a little bit contradictory to me that on one page you're saying it really did little to connect them, and on the other stage you're saying it's... I don't say it does nothing. It clearly is the statement in which it was the only piece of evidence in the entire trial where the vessel or the lockbox comes in. That is damaging. If you look at both Judge Gallagher's ruling in the record and subsequently Judge Eckman's written ruling on post-trial motion, they both cite that. Yeah, but the fact that something came out during his testimony that was damaging, is that the litmus test we give to whether or not we suppress the statement? I mean, the clarity of the answer is made by the defendant himself. Isn't that something we should look at? Yes. And I was simply addressing Justice Burke's specific question about whether it was... I took that question, I mean, whether it was prejudicial. Prejudicial. In fact, in the State's briefing on page 27, they refer to that statement as the single biggest piece of evidence or most damaging evidence against the defendant. And both judges clearly agreed on that. So, no, I don't believe that... I mean, if that were the standard, every statement against anybody's interest would be held out. But the issue here, separately, is whether or not he clearly understood his Miranda rights and, frankly, why he was being asked. And I think the record is replete with information that shows this court he really didn't.  His right to testify. Our standard of review for the right to testify is what? I mean, it's set out in both of the different briefs, de novo or manifest way. I believe that my understanding is that that would be de novo because it is an absolute constitutional right. Did the court clearly advise him about his right to testify? Didn't the court ask him whether or not he decided to testify? It wasn't in court, yes. So then how do you make the allegation or raise the issue that he was denied his right to testify? I would defer on that argument to the defendant's testimony during the post-trial motions that he did not understand what it was necessarily that he was waiving. But there was no testimony or any evidence at all in the record that he made a contemporaneous request to testify either before the court or to his attorney in private. As to the first part, absolutely. As to the second part, it was clear that there were discussions between the two of them which led my client to believe that he was going to testify. Does that satisfy the standard under, I think it was a whiting or one of those cases out there, that in order to meet that test, that the defendant has to tell his attorney contemporaneous with the time when this is happening? No, I want to testify. I would argue yes. Thank you, Mr. Yoder. Thank you. Do you have time for a final argument? Thank you. Mr. Schmidt, you may proceed. Mr. Schmidt, do you have a different view of the tape after watching it? Yes, Your Honor. I would just like to say good morning to the court and the counsel. May it please the court, my name is Matthew Schmidt. I am representing the people in this matter, and I do have a very different interpretation of the tape. I believe the case I cited, people he quotes, says a statement is not involuntary where the answers are intelligent, direct, and positive. And in general, while the defendant was a little bit slow at times, the answers were direct, intelligent, and positive. He answered the questions clearly. I think there was only one instance where he couldn't come up with a word, and that was specifically when he was talking about racking the weapon. He couldn't think of a specific term, rack. But other than that, there wasn't really any indication that he was having trouble understanding what was going on or the questions posed to him. In fact, one of the detectives also testified that his answers were direct and positive, and they seemed to be aware of what was going on. He remembered being in the helicopter ride to the second hospital. He did at one point say, yeah, I know my foot kind of hurts or I can't move this foot. And he also, I believe he did say that it wasn't yet time for his medication. But specifically as to the Miranda rights, he said – Let me go back. You're – Mr. Yetter relies on POTE, too. How is his interpretation of POTE incorrect and yours correct? I believe defendant's case is that tries to distinguish it by saying, well, in that we had evidence, we had testimony from an investigator and from a doctor. In this case, we have testimony from one of the investigators, and we have the video itself, which I don't believe was available in POTE because I think it's from a 1970s case. I don't think – there's nothing in the record for that that had a video. So we can actually see the defendant speaking to the police. We have the testimony from Investigator Wolcott saying, yeah, you know, at the hospital three days before, we kind of looked off and we caught him in a contradiction. But in this case, he seemed okay. And you can tell from the video, from the transcript, that he in fact understood what was going on. And as I was saying previously, the Miranda rights, he said, well, you know, so you guys can use whatever I say against me, right? And I go, yes. So he doesn't sign the waiver. But then he says, well, you know, it doesn't really matter. I'll just tell you what happened anyway. And then at another point he says – they ask, you know, do you have a right to an attorney? You know that. He says, well, you know, even with an attorney, without an attorney, I'm just going to say the same thing. So it doesn't really matter. So obviously he was aware of his Miranda rights and understood them or else he wouldn't have been able to say, well, you guys can hold it against me. And they say yes. And in fact, after – again, after he refuses to sign the waiver, one of the detectives asks him, so you understand everything, right? And he goes, yeah. So I think it's pretty clear from the video that he had a good grasp of what was going on. Sometimes maybe he was slow. Maybe he had to think about things. Maybe because his story was changing. I'm not sure. But all in all, I think the totality of the video shows that he knew exactly what was going on and he completely and honestly answered the questions. If the statement was thrown out at some point in time, would you still have enough evidence to convict him based on the evidence that was in the record from the two other witnesses? I believe we would, Your Honor. We have him at the house handling the gun. We have Cervantes bringing him, bringing the cocaine. So we know that the two came together. Cervantes brought the cocaine and brought the defendant. We have the testimony of the two other co-defendants saying, well, I gave the gun, I believe it was Vasquez gave the gun to Rodriguez, then Cervantes asked Rodriguez for the gun and then gave it to the defendant. So we have him at the scene with a gun outside of the only way to get in or out of the basement. Do you have any ballistics? Yes. There were three weapons used, two .45s and a .380, I believe. The defendant was holding one of the .45s. I think, if I recall correctly, that Mr. Diaz, the one who was never caught, was the person with the .380, just based on where things were. I'm sorry, the victim had the .380. I think the .145 that was kind of out there was never found, but it was. The bullet in the victim's head that was lying at the top of the steps, what was that? That came from the .45 that the defendant was holding, the .145 that was recovered from the scene. So we have all that, plus we have the things from his statement where he talks about buying the safe with the cocaine in it. He's going around with Cervantes, the man who is basically the drug provider in this case. He admits that he knew that a drug deal was happening, and actually at one point, around an hour, 28 and 30 seconds, he says, everybody was going to make some bread off of it when he's talking about the drug deal. He doesn't say they were going to make some bread off of it or those guys were going to make some bread off of it. He says everybody was going to make some bread off of it. And we also have things about consciousness of guilt. He tells the police that his name is Angel Cruz Rizari. Obviously, that is not the case. His story changes from this guy ran up the stairs and was shooting at me, and they took my gun and shot it a bunch of times, and they ran off, and this mysterious man in black to finally admitting that, yeah, he had a gun and he fired it at the guy. And then, well, I didn't know what was going on in the basement. And then it's, well, I knew that it was maybe a drug deal or a gun sale going on in the basement. And then it's, oh, yeah, I knew there was a drug deal going on in the basement. So definitely, Justice Berg, as I said, in totality of the circumstances, there is a bunch of evidence to connect a defendant to this crime, both with and without the statement. And really, as to the right to testify, there's nothing in the record to show that a defendant was actively denied his right to testify by counsel.  According to this court's opinion, people v. Whiting, it's a manifest weight of the evidence because the motion came before sentencing. But I think even under the de novo standard, there's just nothing in the record to indicate that he was denied his right to testify by his counsel. Counsel is entitled to give him advice, is he not? Correct. Counsel advised him not to testify. But according to Mr. Solano's testimony at the hearing on the post-trial motion, he explained fully that it was totally up to him. The judge himself admonished the defendant, you know, your attorney can give you advice, but in the end, it is your decision. He said, is it your wish not to testify? And the defendant says yes, and that's pretty much the totality of it in the transcripts. There's nothing to indicate the defendant tried to assert some right to testify at all. So as far as that issue, there's just really nothing in the record to support that. When Mr. Solano testified at the post-trial motion, did he indicate whether he ever looked into the voluntariness of the statement at all? He said that he watched the video and that there was nothing in the video to indicate to him that there would be a good faith basis for a motion to suppress. I believe the testimony said that he didn't know specifically what medications the defendant was on, but that he knew he was on medication, and the defendant never said to him, oh, I don't remember giving the statement, I don't remember anything. Basically, the defendant's memory disappeared from the time he was shot until at some nebulous point in the trial, according to him, but he never told Mr. Solano's attorney any of that. So Mr. Solano testified that he just didn't think that there was anything there on which to file a good faith motion. He was shot in the hip, right? Where was he shot? Once in the groin and once, I think, in the shoulder. And he was released from the hospital and the very next day he's at the police station? Yes, Your Honor. And that was how many days after he was shot? That would be three, I believe, three or four. Okay. And the defense attorney never looked into what meds he's on or what type of pain he's in after he's been shot in the groin and in the shoulder? Other than looking at the video and saying, hey, it looked okay to me. As I said, Your Honor, as far as I know, he knew he was on medication. The record doesn't show that he knew specifically what medications. But looking at the video and combined with the fact that the defendant didn't say, I'm having trouble remembering things or I'm in such horrible pain that I don't understand what's going on, I just don't really see how that motion could have succeeded, which is the standard in Gibbons for whether or not a motion should have been filed. It's just not enough there. Wouldn't it have been the obligation of the attorney to get the medical records and to make the assessment beyond just looking at the video? I don't know if it's an obligation. It's certainly, if it were my client, I would probably want to do that. But from the totality of the circumstances, there's just not enough for it to succeed. I can't really speak to standard practice as a trial attorney, but the standard is whether or not the motion would have succeeded, and I just don't think that's possible here where we have the video with direct answers. We have the testimony from the police officer saying, yeah, he seemed okay. And then a sudden inability to remember is not enough. There has to be some sort of evidence. There's just nothing in the record that would point to him not being able to understand what was going on. You said Solano testified, but the defendant never indicated to him that he could remember a bit before the trial. Correct. Any indication Solano asked, he inquired on this topic? I don't recall. I don't believe that was ever testified to. But I would think that if you were the defendant and you had no idea what was going on in your own trial, you would probably want to ask. I think that's a relatively reasonable inference that you'd like to know. I'm not talking about the trial. I'm talking about what happened at the police station. Right, yes. No, he never inquired. Actually, I was confusing the two because at the end of the trial, the defendant says, oh, I don't remember anything. From the time I got shot, at some point, I guess, right after he was found guilty, I don't remember anything. I didn't know what was going on. But there's really no indication of that besides defendant's testimony, and that's just not enough. There needs to be something else. Unless there are any other questions. We humbly ask the court to affirm the defendant's sentence. Thank you, Mr. Schmidt. Thank you. Mr. Yetter, rebuttal argument? Yes, thank you. I'd just like to address a couple of things that were raised there. Just as I know, Mr. Solano had the medical records. They were in his possession. He never looked at them to see what the medications were. And we know he never looked at them from the record, or you're surmising that? No, we know it from the record. At post-trial motion, he was asked, did you look at what the medications were that he was on? And he said, no, I didn't. He had the records, and we know he had the records because they were used at the trial. The records were actually tendered to him in discovery. And I'm not a doctor, but he was on a heavy load of painkillers. So if they were tendered to him and they were used during the trial, he had heard what type of medications he was on? I don't believe the words on the medications were ever. You don't believe the what? The words. The use of them at the trial was not about what medications he was on after. They were actually, as you asked about, I'm sorry, someone had asked about ballistics. There was a lot of discussion about ballistics and gunshot. And it was about his wounds that were received. But the issue specifically about after the shooting, what medications he was on, never comes up at trial. So you had tried to distinguish Pote stating, well, in Pote there was medical testimony wherein the doctor said, yeah, he was on meds, but he was able to think clearly. And we don't have a medical expert in this case indicating that the defendant was able to think clearly. But as your opponent points out, in Pote he didn't have a dividend either. That's correct. It was a 1972 case. And the reason really that I addressed Pote was because Judge Ackman relied on it heavily in his written decision. That was essentially where the basis for that decision comes from. And the point I was trying to make was simply that in Pote the issue was that the court was addressing a hearing that was done and whether it was sufficient under the standards to suppress the statement. In this particular case we're talking about whether there's sufficient evidence that a hearing should have been run. But as far as ineffective assistance of counsel goes, you can't say counsel was ineffective for failing to file a motion to suppress. You must take it that one step further based upon writing to Strickland and say that he would have been successful. The likelihood was that he would have been successful at a motion to suppress. So the ineffectiveness is not just the failure to file a motion to suppress. It comes back to Pote. Would he have been successful were he to file a motion to suppress, correct? Yes, I agree absolutely. And the answer is yeah, I believe he would have been successful. The defendant's testimony is he doesn't understand. The video shows that he's slow. And there's medical evidence that he's heavily medicated. And I believe in the totality of all of those circumstances it gets suppressed. Again, counsel refers himself to the statement as the single most damning piece of evidence against Mr. Herrera. What was the medical evidence of the post-trial motion that he was heavily medicated? We went through what the medications were and what they were. We didn't call a medical expert. We put the medications into the record, and the defendant then talked about the pain. If you read the defendant's testimony, what pain he was having and what his ability to understand was. And his ability to understand was clearly diminished. If you just throw out a bunch of names of meds and say 20 milligrams of this and 40 milligrams of that without some extra testimony to say how that affects somebody, what difference does that make? We have the defendant's testimony that I remember. He's on some medication, but without some expert testimony to say this would have definitely made a statement in voluntary. What effect it would have had on him that would have made a statement in voluntary. I mean, how do we get to the- Well, medical evidence- Excuse me, I'm sorry. Medical evidence itself is not the end all, be all. But we do have the defendant's testimony talking about what effect his medications and his pain had on him. And it's direct and it's really clear. There was one other thing that I would say. The use of an alias during the statement, which was referred to as consciousness of guilt, not at that point in the record but much later in the record during the post-trial motions, you'll see my client had a warrant out for his arrest out of, I'm sorry, it's either South Dakota or North Dakota. At the moment, I can't recall. I believe his testimony was he was trying to avoid service of that warrant. He also gave false statements about what actually happened originally to the police. He said he was shot on the sidewalk. He wasn't forthright right off the bat, was he? Oh, no. I wouldn't say that. I was just simply addressing the issue of whether or not it's that particular, it was addressed specifically as consciousness of guilt. And I believe that specifically that one is not. Thank you. We would like to thank both the attorneys for their arguments today. The case will be taken under advisement from our attorney.